Filed 12/5/13  In re Jade B. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re JADE B., a Person Coming Under the Juvenile Court Law. | B243950 (Los Angeles County Super. Ct. No. CK91195) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. WILLIAM B., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County. Jacqueline H. Lewis, Juvenile Court Referee.  Affirmed.

John L. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel and Tracey F. Dodds, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minor.

\* \* \* \* \* \*

Appellant William B. (Father) appeals from the juvenile court's orders denying his motions to dismiss dependency petitions filed pursuant to Welfare and Institutions Code section 300,[1] a jurisdiction order sustaining a dependency petition under section 300, subdivision (b), and a disposition order declaring the child Jade B. a dependent of the court and terminating jurisdiction with a family law order giving Rebecca R. (Mother) sole physical and legal custody and requiring that Father not contact Jade.

We affirm. Both the initial and the amended dependency petitions stated a basis for jurisdiction under section 300, subdivision (b) on the basis of Father's lying about and exaggerating Jade's medical condition and his harassment of medical professionals. Further, substantial evidence supported jurisdiction, as the evidence showed his conduct created a risk of harm to Jade. Finally, the juvenile court acted within its discretion in terminating jurisdiction with a no-contact order, as Father's conduct demonstrated that less restrictive alternatives would not be effective to protect Jade.

## FACTUAL AND PROCEDURAL BACKGROUND

*Detention.*

Father and Mother are the unmarried parents of Jade, born in January 2010. They were previously involved in a family law case in Florida, where Mother filed a petition seeking to establish paternity and Father subsequently sought full custody. They were also parties to an open family law case in San Fernando, California. On October 24, 2011, the trial court in that action granted Mother sole legal and physical custody of Jade.

Jade came to the attention of the Los Angeles County Department of Children and Family Services (Department) through Father's October 26, 2011 referral alleging that Jade had a seizure disorder and expressing Father's concern about Mother's ability to care for her and provide a stable home. Two days prior to the referral, Mother had obtained a temporary restraining order requiring Father to stay at least 100 yards away

---

[1] Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

from her, Jade and other relatives.[2]  Approximately two weeks after the referral, Father reported that Jade was having seizures at Mother's home but Mother refused to take her to a doctor.  He further claimed Jade was saying "palo, palo, palo," which meant "hit" in Tagalog.  A few days later, the Department received another referral that when Jade returned to Father's home from Mother's, she was dehydrated and had a high fever.

The social worker who investigated the referrals, Amy Reitsma, found that a number of statements Father made were false and that several medical and mental health professionals had concerns about Jade's well-being with Father.  She reported that Dr. Edith Hartoonian opined Father appeared to be mentally unstable and displayed symptoms consistent with borderline personality disorder.  Dr. Hartoonian had seen Mother and Father together for counseling seven times between April and December 2011.  She stated that while she saw no dysfunction in Mother, she observed Father tell multiple lies and recommended he undergo individual therapy.  Reitsma further reported that Father's behavior led several other medical professionals, including Jade's pediatrician Dr. Stephanie Whang, Dr. Michelle Thompson and Dr. Larry Sherman, to suspect that Father made up and/or exaggerated Jade's symptoms in order to seek healthcare.  She added that Dr. Whang and Dr. Thompson thought Father might be displaying symptoms of Munchausen by Proxy,[3] and Dr. Whang was further concerned that Father could take deliberate action to make Jade ill.

According to Reitsma's investigation, a public health nurse for the Department opined, on the basis of information from Dr. Whang, that Jade suffered from febrile seizures triggered by a fever and resolving once the fever subsided.  Reitsma further reported that Beverly Daly, a social worker for Children's Hospital Los Angeles (CHLA), stated Father brought Jade in on November 19, 2011, claiming she had been sick for six

---

[2]     At the conclusion of a December 8, 2011 hearing the trial court dissolved the temporary restraining order and reinstated an existing custody and visitation order.

[3]     Munchausen by Proxy is a form of child abuse that occurs when a parent seeks unnecessary medical attention for the child.

3

weeks and Mother was too mentally ill to care for her. She and Dr. Thompson determined that Father had blown Jade's symptoms out of proportion and found Mother to be an appropriate caretaker. Though Daly had no safety concerns for Jade with Father, she thought Father needed psychiatric help.

In an interview with Reitsma, Dr. Whang expressed concern that Father was taking Jade to different doctors, misstating her symptoms and providing an inaccurate medical history so they would do a workup on her. She felt she could not believe anything Father said. Once on December 9, 2011, Father showed up at Dr. Whang's office without an appointment, stating he wanted Jade examined before any abuse happened to her. Dr. Whang explained that Jade suffers from febrile seizures that accompany a high fever. Such seizures do not require a neurological consultation. She opined that Jade would grow out of them and that no medication was necessary beyond children's Tylenol. She added that Mother had always been able to care for Jade.

Mother was currently residing with her niece, Jennifer C., who expressed concern about Father's taking Jade in and out of hospitals. She further stated that even though Mother had a restraining order against Father, he continued to harass their household. Though acknowledging that Mother and Jennifer were concerned about Father's harassing behavior, Jennifer's husband did not have any mental health concerns about Father.

Over the course of three interviews, Mother provided some background about the family. She and Father received a custody decree in Florida giving her full custody of Jade and Father two weeks' visitation per year. At one point, Father took Jade to South Carolina and Mother ultimately flew there to retrieve her and bring her back to California. Mother confirmed that Jade suffers from febrile seizures—five since January 2011. She stated that Jade always seemed to suffer from additional health issues when she was with Father. She also expressed concern that Father was taking Jade to multiple doctors, giving her dietary supplements and bathing her every time she defecated. Mother further explained that "palo" also means "to clap hands" in Tagalog.

4

Reitsma also conducted three interviews with Father and characterized him as being "all over the place in speech." He expressed concern about Mother's mental health and Jade's serious medical conditions. He said Mother was mentally unstable and unable to care for Jade, and frequently returned Jade to him dehydrated. He believed Dr. Whang had too many patients and had not properly diagnosed Jade's condition, given that Jade had been ill for six weeks and her fever spiked several degrees in seconds.

Medical records showed that Father had taken Jade to various doctors during late 2011. Dr. Whang diagnosed Jade as having sinusitis and prescribed antibiotics. Father took Jade to Dr. George Stoneman on December 13, 2011; he documented that Jade had recently recovered from an ear and sinus infection. Both Mother and Father also visited Dr. Whang throughout 2011 for various reasons—a well baby visit, feeding problems and Jade's seizures.

On the basis of this information, the Department detained Jade from Father on December 19, 2011 and placed her with Mother. On December 22, 2011, the Department filed a section 300 petition, alleging a single count pursuant to subdivision (b) that Father placed Jade in an endangering and detrimental situation by subjecting her to repeated medical examinations despite receiving professional opinions to the contrary; that he repeatedly took her to hospitals requesting that tests be performed and medications administered; and that he gave her dietary supplements and subjected her to excessive bathing. Mother and Father appeared at the detention hearing the same day. The juvenile court also received Dr. Whang's records for the hearing.

At the continued detention hearing the next day, the juvenile court acknowledged there had been a family law order issued in Florida and that Father objected to the juvenile court's jurisdiction on that basis. The juvenile court made emergency findings detaining Jade and set the matter for a hearing pursuant to section 319. It permitted Father monitored visitation in a neutral setting. It also set the matter for a contested detention hearing. Father thereafter filed a memorandum of points and authorities concerning jurisdiction, arguing that all proceedings should be held in Florida because a child custody order had been issued in that state. He also filed a "motion akin to

5

demurrer," seeking dismissal of the section 300 petition on the ground it failed to state a basis for juvenile court jurisdiction.

Reitsma testified at the January 3, 2012 contested detention hearing. She claimed that she pursued removal not because Father took Jade to the doctor excessively, but because multiple professionals expressed concerns about Father's mental health. Given that her testimony was based primarily on what medical professionals had told her, the juvenile court deemed it "almost completely irrelevant" and a "waste of time."

The next day, Dr. Whang testified. She had seen Jade approximately 10 times since March 2011. She determined that neither a pediatric referral to a neurologist nor medication was necessary for Jade's febrile seizures. She became concerned about Father after he took Jade to CHLA, reporting that she had been suffering from a fever for six weeks. She was also concerned after Father twice came to her office without Jade, once asking for an appointment to evaluate her, "specifically the vaginal area, because he wanted her checked out before the abuse started," and once seeking medical records.

Dr. Sherman testified by telephone. He was a pediatrician in Dr. Whang's group who saw Jade once and referred her to a pediatric neurologist. Although he thought Jade's condition was consistent with febrile seizures, Mother's and Father's different accounts of Jade's seizures showed the possibility of a different etiology; Mother said Jade always had a fever with the seizures, and Father said she sometimes had seizures without a fever. Regardless, though, he most likely would have made the referral even for febrile seizures. He did not recall expressing concern about Father's mental state, though he was concerned that Mother and Father disagreed about Jade's seizure condition.

Father also called psychiatrist Dr. James Long, who provided a psychiatric evaluation of Father dated January 2, 2012. Though he concluded Father suffered from adjustment disorder with anxiety and some obsessive-compulsive personality traits, he found that Father posed no risk to Jade.

Following argument by counsel, the juvenile court found a prima facie case for detention, explaining that "when there is a parent that is either exaggerating or lying

6

about a child's medical history, this Court believes it places the child in substantial danger because a doctor can only make medical diagnoses and treatment plans based on history." It ordered that temporary care and placement of Jade be vested with the Department and that she remain released to Mother. In an effort to confirm Jade's diagnosis, the juvenile court further ordered that she be examined by a neurologist and permitted Mother and Father to submit Jade's medical history in writing.

*Amended Petition.*

The Department filed an amended section 300 petition on January 12, 2012, adding allegations under subdivision (a) that Father had a history of domestic violence and emotionally abused and harassed Mother, and under subdivision (b) that Father suffered from mental and emotional problems that placed Jade at risk, and that his history of domestic violence placed Jade at risk.[4] Simultaneously, the Department filed opposition to Father's motion akin to a demurrer. The trial court heard and denied the motion as it related to the original petition. It further noted that it found good cause to continue the jurisdiction hearing on the basis of a telephonic conference with the judge in Florida handling Mother's and Father's custody dispute. Thereafter, the juvenile court heard and denied Father's petition for rehearing of the detention findings.

On January 20, 2012, though the Department reported that Father was now residing in Florida and therefore could not provide a definite time frame for visitation with Jade, he continued to participate fully in the proceedings. Between January 15 and 18, 2012, he had three, three-hour, appropriate monitored visits with Jade. In a February 14, 2012 order, the Florida court declined to exercise jurisdiction. Thereafter, Father walked on a request to liberalize his visitation. The Department provided information including Father's recent visitation schedule, a 2006 restraining order against Father issued in favor of his ex-girlfriend's boyfriend in Florida, a 2010 police report concerning Father's stalking Mother, November 2011 police reports by Mother that

---

[4]     There is no indication in the record that the juvenile court held a further arraignment or detention hearing on the amended petition.

Father violated a restraining order, and a supplemental declaration previously filed by Mother in connection with the restraining order. The Department further reported that Mother took Jade for a neurological evaluation as directed by the juvenile court, and the neurologist concluded Jade suffered from febrile seizures and gave no new treatment instructions.

### *Jurisdiction/Disposition Report.*

The Department interviewed Mother, Reitsma and Drs. Whang, Thompson and Hartoonian for the February 15, 2012 jurisdiction/disposition report. Mother and Reitsma confirmed the accuracy of the petition's allegations. Drs. Whang and Hartoonian declined further comment on the matter. Dr. Thompson described Jade's November 2011 admission to CHLA and expressed some skepticism about Father's claim she had been suffering from a fever for four to six weeks. Father declined to be interviewed on the advice of counsel. The Department characterized Mother as a "sincere and responsible person," and expressed no concern about her credibility or ability to care for Jade. On the other hand, it noted that Father had demonstrated a lack of credibility throughout the proceedings. The Department added it had contacted other individuals who asked not to be interviewed or quoted due to concerns about Father's mental health and their fear of potential subpoenas and/or lawsuits. The Department attached court records from the Florida and San Fernando cases, Jade's medical records, visitation reports by Father's monitor and letters endorsing Mother's character and parenting ability.

On February 22, 2012, Father filed another "motion akin to demurrer" directed to the first amended petition. He also requested judicial notice of the records in a domestic violence case, a child custody case and a paternity case in Florida. In addition, he filed evidentiary objections to any and all documents the Department may seek to introduce throughout the proceedings.

### *Jurisdiction Hearing.*

Before the contested jurisdiction hearing began, the juvenile court learned that during a visit that was supposed to be monitored, Father had taken Jade to Dr. Long's

office for a one-hour interview so the doctor could observe the interaction between Father and her. The juvenile court ordered that Father's visits be monitored by Department personnel at the Department's offices. Also prior to the jurisdiction hearing, the juvenile court denied Father's motion to dismiss and overruled his evidentiary objections. The Department also reported an interview with Dr. Hartoonian. During her seven sessions with Mother and Father, "she observed how Mother appeared very reasonable and open to having father actively involved with Jade. However, it became clearer that Father was more concerned about attacking and demeaning Mother rather than working with Mother to resolve differences." Dr. Hartoonian also reported that Father went to her home with a subpoena more than once and called her office pretending to be a new client. She was fearful as a result of his behavior.

The jurisdiction hearing commenced on March 14, 2012 and continued intermittently until mid-August 2012. At the first hearing, the juvenile court admitted into evidence all the Department's prior reports, subject to cross-examination of the social worker. Mother testified that she and Father lived together for approximately eight months after Jade was born. She described violent altercations involving Father and Father's emotionally abusive and harassing behavior that occurred both before and after Jade was born. After Jade's first hospitalization in November 2010, Father proposed they relocate to California to start a new life and she agreed to withdraw her legal action in Florida. Once in California, they sought counseling from Dr. Hartoonian to facilitate a co-parenting plan.

Mother stated that Jade continued to suffer from febrile seizures, the most recent occurring approximately one month earlier. She expressed concern about Father giving Jade protein, whey and other supplements from the time she was an infant. She was also concerned about Father's giving incorrect information about Jade's condition to medical personnel. She testified about Father's taking Jade to South Carolina for two weeks in September 2011 and then refusing to return to California unless Mother agreed to meet him in South Carolina. Mother admitted that when she went to South Carolina she spent a few days in a resort hotel with Father and Jade before returning to California.

On April 9, 2012, when the juvenile court resumed the continued jurisdiction hearing, the Department reported that Jade had suffered additional seizures and was hospitalized. She was prescribed medication for her seizures. The Department also reported what it characterized as harassing behavior by Father, including making repeated calls to and visiting various Department personnel, as well as Father's untruthful statements to the Department and "hypervigilant" behavior regarding Jade's health. At the continued jurisdiction hearing on April 17, 2012, the Department reported that doctors had differing opinions as to whether Jade should be on anti-seizure medication, but the juvenile court denied the request to have an expert evaluate her condition.

The hearing resumed two days later; after the Department rested, Mother called Father to testify as her only witness. He denied doing anything that would have led Mother's boyfriend to seek a restraining order against him, testifying that he learned of the relationship by reading her diary and that Mother ran off with the boyfriend because she was a "sex addict." Father denied ever making a referral to the Department. He denied asking Dr. Whang to give Jade a vaginal exam, but admitted he took her to see Dr. Whang after Mother had accused him of sexually assaulting Jade in Florida. He accused Dr. Hartoonian of lying, claiming that during their sessions the doctor had diagnosed Mother with reactive attachment disorder. He claimed Mother lied and physically injured herself on occasion. He denied ever going to Dr. Hartoonian's home, but stated he sent his friends there to serve her with a subpoena. He produced an engagement ring he claimed to have given Mother on October 25, 2011. He admitted to providing Jade with over-the-counter supplements and coconut water, and asking Mother to do the same.

Father filed a section 385 petition requesting liberalized visitation, and the juvenile court determined it would rule on the petition when it made its jurisdictional findings. The jurisdiction hearing resumed on May 14, 2012 with testimony from social worker Jill Kaufman who prepared the jurisdiction/disposition report. The Department reported the same day that Jade's physicians' group, including Dr. Whang, would no longer provide care for Jade because they "haven't been able to maintain a rapport . . . due to many

10

subpoenas." Kaufman testified that before preparing her report, she did not verify the Florida court records provided by Mother. Dr. Thompson was the only doctor with whom she spoke, in part because other doctors did not want to talk with her for fear of being sued by Father. She did not look into the petition's allegations regarding dietary supplements and excessive baths. She discussed a recent incident in which Father had contacted the Burbank police to report that one of the relatives with whom Mother resided had slapped Jade; the slap was actually from another toddler at daycare. The incident resulted in Mother's relatives requesting that she and Jade leave their home.

The social worker then assigned to the case, Randy Slavich, also testified. He met with Father weekly and was responsible for assuring he received reunification services. At one point, he told Father he thought the order for one hour per week of visitation at the Department offices was too restrictive. At the time of his testimony, he believed that while the visits should remain monitored, Father and Jade could benefit from additional time together because they had positive interactions. He believed that Department staff monitoring was necessary, in part, to ensure Father refrained from making derogatory comments about Mother in front of Jade. He also opined that Father's mental health issues placed Jade at risk of emotional abuse, explaining that Father's "interaction with the world—professionals, people that are involved in the case, people that are at my office—are manipulative, controlling, unpredictable, emotionally inappropriate," and that he found shocking the "evidence of an all-around ongoing inability to interact appropriately in the world in a way that could protect this child." He added that the Department had discussed adding extra security because of Father's behavior.

Social worker Reitsma testified next regarding a risk assessment she prepared in December 2011. Dr. Thompson, Jade's treating pediatrician at CHLA during a November 2011 emergency room visit, also testified. She ordered that Jade be given intravenous fluids because she received a history that Jade had not been drinking appropriately; she did not personally observe symptoms associated with dehydration. She did not recall telling Daly that she suspected Father suffered from Munchausen. She

11

is a mandated child abuse reporter and did not make any report of suspected abuse by Father.

When the jurisdiction hearing resumed, the Department offered letters showing that Father had been attending anger management and domestic classes, and the juvenile court permitted Father's visitation to increase to two times per week. CHLA social worker Daly testified that when Father brought Jade to CHLA in November 2011, she contacted the Department because she knew there was an ongoing investigation. She did not have any safety concerns for Jade with Father and did not see evidence of abuse. Father did, however, exaggerate Jade's condition when they arrived at CHLA. She observed that Father appeared to be afraid of losing Jade given his relationship with Mother. Father was anxious and aggressive, and Daly felt more comfortable talking with him in public areas.

On June 14, 2012, the Department provided the juvenile court with two items. First, it provided a copy of a May 2012 order of dismissal in the Florida family law matter on the ground that California was a more appropriate forum. The order noted instances where the court had found Father not credible. Second, the Department reported an interview with Jade's paternal grandmother, in which she stated she thought Jade's placement should be with Mother, not Father. Though stating she loved her son, she thought he was manipulative and would be that way with Jade; she knew he told stories about Mother and Jade that were untrue, such as that Mother joined a cult and Jade had bruises all over her; and she believed he exercised poor judgment. On the other hand, she believed Mother was a good mother to Jade. One week later, the Department reported that Father had threatened the paternal grandmother and urged her to retract her statements. She subsequently retracted any negative statements about Father.

Several doctors testified. Dr. John Peric saw Jade with Mother and Father during a mid-November urgent care visit. Jade was suffering from a fever, cough, congestion and dehydration, though her lab results were inconclusive for dehydration. He could not recall that Jade showed any signs of abuse or that he thought Father had placed her at risk. Dr. Robert Casey saw Jade at the Henry Mayo Newhall Memorial Hospital in

12

mid-November 2011; she presented with a cough and fever and he ordered a chest X-ray. He diagnosed her as having pneumonia. He did not observe that Father's behavior warranted a child abuse referral. Testifying telephonically, Dr. Anna Law stated she saw Jade at Lakeside Community Health Care, an urgent care center, in April 2012 after Jade had suffered two seizures with a fever and vomited twice. She ordered that Jade be transported by ambulance to a hospital emergency room for further evaluation and treatment.

Pediatric neurologist Dr. Nancy Niparko saw Jade twice during the first half of 2012. She reviewed Jade's April 2012 EEG which was abnormal because of the presence of seizure discharges. She diagnosed Jade as having simple febrile seizures and her prognosis was that the condition would resolve in one or two years. She received Jade's medical history from Mother only. She recommended that Jade not take the anticonvulsant medication prescribed by another pediatric neurologist, Dr. Andrea Morrison. Dr. Jason Lee saw Jade after she had been admitted to the hospital in April 2012. He did not recall that Jade had a fever at the time of her EEG, and the results of the EEG showed she had some seizure discharges. He did not know whether that meant she had seized during the EEG. He conveyed to Father Dr. Morrison's reason for giving Jade medication, which was that she anticipated future seizure activity and hoped to reduce it.

Father called two witnesses who had observed Mother and Father together in public, acting appropriately. One of the witnesses, however, testified about an occasion where he heard Mother yell "help, help" and then hit Father. Father also called Stella Markova, a psychiatric social worker with the Los Angeles County Department of Mental Health who had participated in a team decision meeting with Father in December 2011. She denied providing the mental health diagnosis of Father that was attributed to her in the jurisdiction/disposition report.

Before the jurisdiction hearing resumed in late July 2012, Jade suffered another seizure while at her daycare facility. Daycare staff called 9-1-1 and Jade was transported to a hospital where she presented with a fever over 104 degrees and then had two or three

13

more seizures. Mother told hospital staff that Jade had a fever the night before the initial seizure which she had treated with Tylenol. The hospital treating physician contacted Dr. Morrison, who recommended that Jade be prescribed anti-seizure medication, and Dr. Niparko, who disagreed with the recommendation. The treating physician recommended to Mother that she give Jade the anti-seizure medication, but also consult another neurologist for a third opinion.

A few days later the Department reported concerns with Father's visitation, noting that he would become upset if Jade did not want to engage in an activity he planned, he was quick to think the worst (mistaking Jade's saying "peanut" and accusing her of saying "penis"), and he continued to "grill" Jade about marks or bruises on her body. The Department further noted it had received three referrals alleging physical abuse of Jade by Mother, all deemed unfounded. It recommended that Father's monitored visits occur in a therapeutic setting. The juvenile court agreed with the recommendation, noting that it came close to terminating Father's visitation.

Dr. Morrison next testified on July 24, 2012. She opined that Jade had a seizure disorder that manifested when she had fevers, and thought it was uncommon for her to not take medication for her condition. She opined Jade had epilepsy, which meant she had a tendency to have seizures. She further opined that while fever seemed to provoke Jade's seizures, her EEG suggested she could also have unprovoked seizures. She repeatedly stated that Jade should be on medication. She testified it would not be inappropriate for Jade to have a CT scan or an MRI.

Father called psychologist Dr. Michael Peck, who testified he examined Father and concluded he did not suffer from the mental disorder Munchausen by Proxy. Father's friend and roommate Bounmy Somchay also testified, stating he saw Mother hit and curse at Father. On July 26, 2012, the Department reported that Mother had taken Jade to the doctor for a rash and fever, and Jade was hospitalized overnight after suffering another seizure.

Pediatric neurologist Dr. Charles Niesen testified as an expert on Father's behalf. He opined that Jade should be on anti-seizure medication because of the multiple seizures

14

she suffered. The dangers arising from failing to medicate included Jade falling and hurting herself during a seizure, suffering brain injury from a prolonged seizure and her brain development being compromised by multiple seizures. He opined that Jade's recent seizure activity underscored the nature of her disorder. He added it would not be inappropriate for Jade to have coconut water or other pediatric supplements, nor would it be inappropriate for her to have a CT scan and an MRI. He also believed that many parents exaggerate their child's symptoms and opined that Father did not do anything more than any other parent would try to do under the circumstances. The juvenile court directed Mother's counsel to discuss Dr. Niesen's testimony with Mother to ascertain her position about changing neurologists and/or treatment for Jade.

On August 2, 2012, the Department submitted records from Jade's recent hospital stay, redacting the name of her new pediatrician in view of Father's previous harassment. The report indicated the treating physician had started Jade on anti-seizure medication and recommended that Mother take Jade to the UCLA pediatric neurology group for evaluation. The same day, Father called additional witnesses, including marriage and family therapist Dr. Ian Russ who testified about ethical violations by social workers and other therapists involved in the case; and marriage and family therapist Dr. Kendall Evans who testified he saw no evidence that Father engaged in domestic violence against Mother and was troubled that the Department did not question Mother's veracity.

Father testified. He estimated he had taken Jade to see a doctor approximately six times. He also described the counseling and parenting classes in which he had participated throughout the course of the pending jurisdiction proceedings. He noted that since the dependency proceedings had begun, Jade had bruises and reported to him that Mother had hit her, and during one visit she also had hundreds of boils on her legs. At the conclusion of his testimony, the Department confirmed that Jade had been placed on anti-seizure medication. However, on August 12, 2012, Dr. Niesen wrote a letter to express his concern that Mother had not followed up on Jade's neurology appointment.

On August 14, 2012, the Department submitted last minute information expressing concern that Father continued to inspect Jade for bruises and marks during every visit.

15

After hearing argument from counsel, the juvenile court made its jurisdictional findings the same day.  The juvenile court amended and sustained count b-1 of the petition regarding Father's lying about and exaggerating Jade's medical condition, and dismissed the remaining allegations.  In connection with its findings, the juvenile court noted that while at first blush it might appear that Father was simply trying to make sure Jade received appropriate medical care, "when you hear all of the witnesses, . . . you realize that Father's actions really had nothing to do with Jade and everything to do with him.  In 15 years of sitting on the bench, 22 years of doing dependency, I have never seen someone as controlling as [Father]."  The juvenile court continued:  "From what I could see in the testimony, [Father] exaggerated or lied about, every time he went in, what was going on with Jade.  And to say that that is not dangerous to subject your child to more intrusive medications, to more intrusive tests, et cetera, is not harmful to the child is not—is incorrect.  Doctors rely on what parents tell them.  They rely that that is accurate, unbiased information.  And here Father lied about or exaggerated Jade's condition and has subsequently subjected her to examinations, based on allegations against the Mother, consistently, for nine months."

### *Disposition*.

At the conclusion of the jurisdiction hearing, the juvenile court stated that its tentative disposition order would be to terminate jurisdiction with a family law order giving sole physical and legal custody to Mother and a no-contact order for Father.  Prior to the hearing, the Department submitted a supplemental disposition report making recommendations consistent with the juvenile court's tentative disposition.  The Department noted that Father's behavior had become more bizarre and inappropriate during the past several months and identified several categories of concern:  Between May and August 2012, Father made five unfounded referrals that Mother was neglecting or abusing Jade; Father was obsessed with finding bruises or marks on Jade during visits, and blamed Mother for both physical abuse and for Jade's expression of interests that did not coincide with Father's; Father's referrals resulted in Mother having to move from her relatives' home; Father continued to report exaggerated symptoms to the Department (for

16

example that Jade had "hundreds of boils") and continued to harass her current doctors; and in August 2012 Father's therapist contacted the police to report Father's allegation that Mother was abusing Jade. Conceding that its no-contact recommendation was extreme, the Department also pointed out Father's history of restraining orders involving other individuals, suggesting a pattern of destructive behavior.

At the August 27, 2012 disposition hearing, the juvenile court admitted the Department's prior reports and service logs into evidence. Registered nurse Kathy Wright testified Dr. Whang asked her to write the letter indicating the medical group would no longer treat Jade, noting that office personnel perceived Father's behavior as threatening. Social worker Kaufman testified that Father's behavior posed a risk to Jade, characterizing him as being out of control and his hypervigilance being disruptive to Jade. She stated that all the information she gleaned from those involved in the case showed that Father was focused on proving Mother was abusive and neglectful toward Jade, while the Department had seen no evidence to support that concern. Father called social worker Gayane Manukyan, who responded to Father's request during an August 2012 visit that Jade's feet be examined for bruises. She took Jade to a nurse, who observed some dead, peeling skin on Jade's feet. She advised that a doctor take a look at Jade, but added it was not an emergency situation. Human Services Aid Shamar McDowell monitored approximately 10 visits between Father and Jade, and observed positive interaction between the two. She further observed, however, that Father would harass Jade during the visits and try to elicit negative information about her living with Mother. She also noted that during a recent visit that Father was videotaping, he grabbed Jade's arm and put it in front of the camera, pointing out a bruise. She added that during every videotaped visit Father would attempt to get Jade to play to the camera.

Father also called a therapist who led his anger management group, who testified Father had benefitted from the services he had been receiving. The facilitator of Father's batterers' intervention and anger management classes testified Father had learned some effective communication and stress reduction techniques. Another anger management facilitator testified that Father seemed calmer now than when he began his anger

17

management classes. Father submitted two declarations from individuals who had observed positive interaction between Jade and him. Father testified, describing the programs in which he was participating and stating he was willing to do whatever was necessary to reunify with Jade. During cross-examination, Father noted that he was attending a domestic violence program because he believed he was the victim of domestic violence, as there were several occasions when he was attacked in his sleep and while he was awake.

Following counsel's arguments, the juvenile court declared Jade a dependent of the court under section 300, subdivision (b) and found there were no reasonable means to protect her absent removal from Father's custody. Consistent with its tentative ruling, the juvenile court terminated jurisdiction with a family law order giving Mother sole physical and legal custody of Jade and requiring that father have no contact with her. The juvenile court explained that in making the no-contact order—its first ever—it took into account both Jade's physical and emotional safety, and determined the order was the only way to protect Jade from future harm. It noted that it also considered that Father refused to abide by the safeguards it had put into place to effect visitation between Father and Jade. Summarizing, the juvenile court stated: "It is clear to me that no court order, no recommendation by a professional, and not even Jade's interest—best interest or her wishes can in any way get through to this father to take actions that do not put Jade at great risk. And that is why this court can do nothing else in this particular case other than to order a no-contact order for her."

Father appealed.

## DISCUSSION

Father contends the juvenile court should have dismissed the initial and amended petitions, substantial evidence did not support the jurisdiction order, and the disposition order removing Jade from his custody and requiring he not contact her was an abuse of discretion. We find no merit to his contentions.

18

## I. The Petitions Stated a Basis for Jurisdiction Under Section 300, Subdivision (b).

In dependency proceedings, the parent of the child has a fundamental due process right to notice of "'the specific factual allegations against him or her with sufficient particularity to permit him or her to properly meet the charge.' [Citation.]" (*In re Fred J.* (1979) 89 Cal.App.3d 168, 175, italics omitted.) A dependency petition must contain a "concise statement of facts, separately stated, to support the conclusion that the child upon whose behalf the petition is being brought is a person within the definition of each of the sections and subdivisions under which the proceedings are being instituted." (§ 332, subd. (f).) In other words, "the role of the petition is to provide 'meaningful notice' that must 'adequately communicate' social worker concerns to the parent. [Citation.] If the parent believes that the allegations, as drafted, do not support a finding that the child is 'within' one of the descriptions of section 300, the parent has the right to bring a motion 'akin to a demurrer.' [Citation.]" (*In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1037; accord, *In re S. O.* (2002) 103 Cal.App.4th 453, 460.)

When the sufficiency of a petition filed under section 300, subdivision (b) is challenged on review, we construe the well-pleaded facts in favor of the petition to determine whether the Department pleaded facts to show that Father did not supervise or protect the children within the meaning of section 300, subdivision (b). (*In re Janet T.* (2001) 93 Cal.App.4th 377, 386; *In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1133.) A facially sufficient petition "does not require the pleader to regurgitate the contents of the social worker's report into a petition, it merely requires the pleading of essential facts establishing at least one ground of juvenile court jurisdiction." (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 399–400.)

Here, the initial petition alleged: "On numerous occasions in 2011, the child, Jade['s] father, [], placed the child in an endangering and detrimental situation by subjecting the child to repeated medical examination and has continued to request the child to be checked by a neuropathologist, despite the father being told, by the medical professionals treating the child, that the child has febrile seizures and not a seizure

disorder. The father repeatedly takes the child to hospitals and requests that intravenous, various procedures and medications be administered to the child. On 11/15/11, the father requested that a CAT scan being formed [*sic*] on the child and insisted upon the child being admitted to a hospital for an upper respiratory infection. The father gives the child dietary supplements and subjects the child to multiple bathes [*sic*] during the father's visitations with the child. Such an endangering and detrimental situation established for the child by the father endangers the child's physical health and safety and places the child at risk of physical harm, damage and danger."

These allegations were sufficient to bring Jade within the ambit of section 300, subdivision (b), which requires: "(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.) According to the allegations, Father's subjecting Jade to unnecessary medical examinations and hospitalizations created a serious risk of both physical and emotional harm to Jade. Subjecting a child to unnecessary medical treatment constitutes conduct that warrants jurisdiction under section 300, subdivision (b). (See *In re Kamelia S.* (2000) 82 Cal.App.4th 1224, 1226 [though disentitlement doctrine barred appellate review, juvenile court sustained supplemental petition alleging the father had subjected the child to unnecessary medical treatment].)

In asserting the petition failed to allege a basis for jurisdiction, Father segregates each allegation and argues that each action—viewed alone—was insufficient to support jurisdiction. But it is of no consequence that a single action would be inadequate to support jurisdiction given that the petition alleged multiple acts giving rise to a risk of harm. Construing the well-pleaded fact in favor of the petition, we conclude that the totality of the circumstances alleged were sufficient to show that Jade was at risk. (See *In re J.K.* (2009) 174 Cal.App.4th 1426, 1440 [determining substantial risk in view of the totality of the circumstances].)

Nor do we find any similarity between the conduct in the cases relied on by Father and the conduct alleged in the initial petition. For example, in *In re James R.* (2009) 176

20

Cal.App.4th 129, 136, the court found that the mother's history of instability, coupled with an isolated negative reaction to drinking beer and taking ibuprofen, was insufficient to show how the children were at risk. Similarly, the court in *In re David M.* (2005) 134 Cal.App.4th 822, 830 found no basis for dependency jurisdiction where there was no evidence that the mother's limited marijuana use and history of mental health issues caused or created a specific risk to the child. (See also *In re Alysha S., supra,* 51 Cal.App.4th at p. 400 [allegation that one year earlier the father had touched the infant's buttocks and vaginal area in a manner the mother viewed as inappropriate insufficient to support jurisdiction].) Here, the petition alleged facts showing that Father had engaged in a course of conduct that placed Jade at risk, including his repeatedly taking Jade to the hospital, seeking additional treatment against the advice of medical professionals and requesting that medical tests be performed on her and that she be hospitalized. The petition adequately alleged the essential facts supporting jurisdiction under section 300, subdivision (b).

Our conclusion that Father's motion akin to a demurrer was properly denied effectively disposes of Father's contention directed to the amended petition, as he claims the additional allegations were insufficient to support jurisdiction. Briefly, in the amended petition the Department added allegations under section 300, subdivisions (a) and (b) that Mother's and Father's history of domestic violence, including incidents where Jade was present, and Father's continued stalking and harassment of Mother placed Jade at risk; it also modified the initial allegation under subdivision (b) to omit any allegations concerning supplements and bathing. The Department further alleged under section 300, subdivision (b), that Jade was at risk from Father's mental and emotional problems and anger management issues which had manifested themselves through Father's lying about and exaggerating Jade's medical condition and blaming Mother for her condition.

Contrary to Father's assertion that allegations of domestic violence, without more, are an insufficient basis for jurisdiction, it is well established that "[e]xposure to domestic violence may serve as the basis of a jurisdictional finding under section 300,

subdivision (b). . . . "'[D]omestic violence in the same household where children are living . . . is a failure to protect [the children] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it." [Citation.] Children can be "put in a position of physical danger from [spousal] violence" because, "for example, they could wander into the room where it was occurring and be accidentally hit by a thrown object, by a fist, arm, foot or leg . . . ." [Citation.]' [Citation.] . . . "'Both common sense and expert opinion indicate spousal abuse is detrimental to children." [Citations.]'" (*In re R.C.* (2012) 210 Cal.App.4th 930, 941–942; see also *In re Giovanni F.* (2010) 184 Cal.App.4th 594, 599 [allegations of domestic violence may support jurisdiction under § 300, subd. (a)].) Also contrary to Father's assertion, the allegation concerning Father's mental and emotional problems was directly tied to a risk of harm to Jade created by his lying about and exaggerating her medical problems.

The factual allegations in the amended petition both established a basis for juvenile court jurisdiction and sufficiently provided Father with adequate notice of the specific facts on which the petition was based. The juvenile court properly denied Father's second motion akin to a demurrer.

## II.    Substantial Evidence Supported the Juvenile Court's Jurisdiction Order.

We review the juvenile court's jurisdictional findings under the substantial evidence standard. (*In re E.B.* (2010) 184 Cal.App.4th 568, 574.) Pursuant to this standard, we determine whether there is any substantial evidence, contradicted or uncontradicted, to support the juvenile court's determination. (*In re Tracy Z.* (1987) 195 Cal.App.3d 107, 113.) "[W]e draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.)

Jurisdiction is appropriate under section 300, subdivision (b) where there is substantial evidence that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of

22

his or her parent or guardian to adequately supervise or protect the child . . . .” As outlined earlier, three elements must exist for a jurisdictional finding under section 300, subdivision (b): “‘(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) “serious physical harm or illness” to the minor, or a “substantial risk” of such harm or illness.’ [Citation.] ‘The third element “effectively requires a showing that at the time of the jurisdiction hearing the child is at substantial risk of serious physical harm in the future (e.g., evidence showing a substantial risk that past physical harm will reoccur). [Citations.]”’” (*In re J.O.* (2009) 178 Cal.App.4th 139, 152; see also *In re S. O., supra,* 103 Cal.App.4th at p. 461 [“‘[P]ast conduct may be probative of current conditions’ if there is reason to believe that the conduct will continue”].)

The juvenile court sustained the following allegation under section 300, subdivision (b): “The father, William [B.], has displayed bizarre and obsessive behaviors which place the child Jade [B.] at risk of physical and emotional harm. Such behaviors have included lying about and exaggerating Jade’s medical conditions and symptoms to justify his requests for or a resulting need for unnecessary, intrusive and sometimes painful medical tests for the child, Jade. Father’s behaviors also including stalking the child Jade’s mother, Rebecca [R.], as well as various medical professionals and witnesses. The harassment of some of the medical professional has resulted in those medical professionals being unwilling to treat Jade any longer. Father has been unable to refrain from such behaviors in spite of court orders, requests of professionals or Jade’s needs and best interests.” At the conclusion of the jurisdiction hearing, the juvenile court concluded that Father’s lying about and exaggerating Jade’s symptoms placed her at risk, observing that doctors necessarily rely on what parents tell them about their child’s condition.[5]

---

[5]      In view of the juvenile court’s express finding that Jade remained at risk of serious physical harm, we find no merit to Father’s argument that the court’s findings were improperly premised on a risk of emotional harm. (See *In re Daisy H.* (2011) 192

The evidence showed that from the time the matter came to the Department's attention to the time of the jurisdictional findings almost 10 months later, Father exhibited behavior that "really had nothing to do with Jade and everything to do with him." When Father brought Jade to CHLA in mid-November 2011, he falsely claimed that she had been running a fever for six weeks and that Mother was too mentally ill to care for her. At CHLA, Jade received fluids intravenously on the basis of Father's representation that Jade had not been drinking properly; Jade's attending physician never observed symptoms associated with dehydration. During the jurisdiction hearing, Mother confirmed that on at least three occasions when Father took Jade to the hospital, she discovered he had misrepresented Jade's history to medical personnel. Dr. Sherman, part of Jade's former pediatric group, expressed concern that Father offered a different description of Jade's seizures than Mother. Father brought Jade to Dr. Whang's office in early December 2011 without an appointment, seeking a vaginal examination for Jade before any abuse happened to her. During what was supposed to be an hour-long monitored visit, Father took Jade to Dr. Long's office for an interview so the doctor could observe her interaction with Father.

Though the evidence showed that Jade suffered from a seizure condition and that doctors disagreed about the appropriate course of treatment, there was evidence that much of Father's conduct had nothing to do with her seizures. For example, Father contacted medical personnel when Jade exhibited flushed cheeks; he testified that he observed Jade suffering from multiple bruises and pinch marks at the hands of Mother, as well as hundreds of boils on her skin; and even through August 2012 he continued to inspect Jade for bruises and marks during every visit. For example, during an August 3, 2012 visit, Father saw two small bruises on Jade's arm; he grabbed her arm and placed it in front of the camera that he used to record the visit and described what he saw. During

Cal.App.4th 713, 718 [dependency law does not support jurisdiction on the ground of "'emotional harm'"].)

an August 10, 2012 visit, Father called in a social worker to inspect bruises on Jade's shin that appeared to be a few days old and were fading away.

In connection with the allegations concerning Father's harassment of others, Dr. Hartoonian reported that Father came to her home, not her office, with a subpoena and telephoned her office pretending to be a new client. Father's harassment of Dr. Whang resulted in her no longer providing care for Jade. Father falsely reported that one of the relatives with whom Jade was residing had slapped her, resulting in Mother and Jade having to move from the home. The juvenile court could reasonably infer that evidence of Father's harassment and alienation of medical professionals and others who cared for Jade constituted conduct that also placed her at risk of physical harm. (See *In re S.C.* (2006) 138 Cal.App.4th 396, 415 [appellate court accepts every reasonable inference that the juvenile court could have drawn from the evidence].)

Father argues the evidence was insufficient to show he either misrepresented Jade's symptoms or sought unneeded treatment, emphasizing that the evidence showed some doctors agreed that Jade's seizure treatment was inadequate. He contends that seeking a second opinion does not warrant jurisdiction under section 300, subdivision (b). But his argument rests only on the evidence that was favorable to his position, and ignores the evidence on which the juvenile court relied to conclude he posed a risk of harm. "'A party who challenges the sufficiency of the evidence to support a particular finding must summarize the evidence on that point, favorable and unfavorable, and show how and why it is insufficient. [Citation.]'" (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738, italics omitted.) Indeed, the juvenile court acknowledged that its initial impression of the case was consistent with Father's characterization of his conduct. Observing that most parents want what is best for their children, the juvenile court commented that "at first blush, that's what this case looks like. It looks like a really good parent doing everything [he] can to make sure [his] child gets the right medical care." But the court went on to conclude that when it continued to look at the case, it saw something different. It saw Father as controlling and misrepresenting Jade's symptoms for the purpose of getting back at Mother, without regard to the consequences to Jade. It

25

noted that Father's characterization of Jade's condition differed from that to which doctors testified, and specifically relied on evidence showing that Jade had received intravenous treatment solely on Father's representation of her condition—a representation it found untrustworthy. It is not our role to reassess the credibility of witnesses or reweigh the evidence. (E.g., *In re C.B.* (2010) 190 Cal.App.4th 102, 127.)

Father also argues there was insufficient evidence to show he stalked or harassed medical professionals and other witnesses. The evidence conflicted to a certain extent, with Father's testifying that it was his friend—not he—who had gone to Dr. Hartoonian's home. Notwithstanding this testimony, other evidence demonstrated that Dr. Hartoonian observed Father at her home, and other medical professionals and Department employees provided statements concerning Father's harassing behavior. Father completely ignores evidence showing he harassed Mother's cousin when he made a false police report that the cousin had hit Jade, notwithstanding Jade's statements that a boy at her daycare had hit her. Further, the evidence showed that his conduct placed Jade at risk of physical harm by limiting the doctors who would agree to treat her and by requiring her to move from her home.

Finally, Father argues the evidence was insufficient to show that Jade remained at a risk of harm at the time of the jurisdiction hearing. (See *In re Janet T., supra,* 93 Cal.App.4th at p. 388 [under § 300, subd. (b), "'the past infliction of physical harm by a caretaker, standing alone, does not establish a substantial risk of physical harm, "[t]here must be some reason to believe the acts may continue in the future"'"].) He argues evidence showing that Jade had begun to receive medication for her seizures showed she was no longer at risk. But the evidence further showed that within 10 days of the jurisdictional findings Father continued "to actively look for bruises on Jade," insist that medical professionals examine her for every mark and attribute Jade's condition to Mother's abuse. As summarized by the court in *In re Jasmon O.* (1994) 8 Cal.4th 398, 424, a parent's past behavior can be used for predictive purposes, as "'a measure of a parent's future potential is undoubtedly revealed in the parent's past behavior with the child.'" There was no evidence to suggest that Father's behavior would change, even

though Jade had been placed on anti-seizure medication, and the juvenile court found him "incapable of changing his behaviors in regards to what Jade's best interest[] is." "The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child. [Citations.]" (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.) Substantial evidence supported the juvenile court's determination that Jade remained at risk at the time it assumed jurisdiction over her.

## III. Substantial Evidence Supported the Removal of Jade From Father's Custody and the Juvenile Court Acted Within Its Discretion in Entering A No-Contact Order.

### A. Removal Order.

The juvenile court ordered Jade removed from Father's custody pursuant to section 361, subdivision (c)(1), which provides that a dependent child may not be taken from the physical custody of the parents unless the juvenile court finds by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody."[6] A removal order is proper if it is based on proof of parental inability to appropriately care for the child, as well as proof of a potential detriment to the child if he or she remains with the parent. (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1137, disapproved on another ground in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6.) The parent's level of denial is an appropriate factor to consider when determining the risk to the child if placed with that parent. (*In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044 [denial is a factor often relevant to determining

---

[6] Though the Department reported Mother and Father had a Florida custody decree awarding Mother full custody of Jade and Father two weeks' annual visitation, the evidence suggested that Jade spent more than two weeks per year in Father's custody. In any event, neither Father nor the Department has challenged the juvenile court's treating Father as a custodial parent for purposes of the disposition order.

whether persons are likely to modify their behavior in the future without court supervision].)  Because the focus of the statute is on averting harm to a child, the parent need not be dangerous and the child need not have been actually harmed before removal is appropriate.  (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917; *In re Diamond H., supra,* at p. 1136.)

We apply the substantial evidence test to challenges to a disposition order removing a child from a parent.  (*Kimberly R. v. Superior Court* (2002) 96 Cal.App.4th 1067, 1078; see *In re Mark L.* (2001) 94 Cal.App.4th 573, 580–581 [although juvenile court makes findings by the elevated standard of clear and convincing evidence, substantial evidence test remains the standard of review on appeal].)  As with the jurisdictional findings, we view the evidence in the light most favorable to the juvenile court's determination, drawing all reasonable inferences in favor of the determination, and we affirm the order even if there is other evidence supporting a contrary conclusion.  (*In re Heather A., supra,* 52 Cal.App.4th at p. 193.)  Father bears the burden of showing there is no evidence of a sufficiently substantial nature to support the order.  (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

Substantial evidence supported the removal order, as it showed that Father's conduct continued to pose a substantial danger to Jade.  The evidence demonstrated both an "identified, specific hazard" and that Jade was "of such tender years that the absence of adequate supervision and care poses an inherent risk to [her] physical health and safety."  (*In re Rocco M., supra,* 1 Cal.App.4th at p. 824, italics omitted.)  Even in the context of monitored visitation, Father continued to obsessively inspect Jade for marks or bruises, intent on finding something to support his accusations of physical abuse against Mother.  At the disposition hearing, social worker Kaufman testified about the effect of Father's behavior on Jade, describing an instance when Jade had drawn on herself with a marker and said "look, bruises."  She also observed Jade's increasing agitation when Father would complain about Mother or the Department in front of her.  She stated that Father would become frustrated when Jade did not do as asked, and explained that while

28

his reaction to a stubborn toddler was not necessarily atypical, it raised concerns in light of his other behaviors.

Even at the disposition hearing, Father failed to acknowledge that his behavior posed any risk to Jade. Though he outlined the number of classes he had been attending for anger management and domestic violence, he insisted he was attending as a victim, not a perpetrator. When asked whether he had lied about or exaggerated Jade's symptoms, or whether he had stalked the medical professionals treating her, he kept repeating that he was willing to accept the court's findings and said nothing more. In view of this evidence, the juvenile court could reasonably conclude that Father had done nothing to alleviate the conditions that posed a risk to Jade. (See *In re Jessica B.* (1989) 207 Cal.App.3d 504, 517 [substantial evidence supported removal where the father's "failure to admit fault indicates that he is neither cooperating nor availing himself of the services provided"].)

Contrary to Father's argument, the evidence further demonstrated that less restrictive alternatives to removal were not available. Even in the context of limited and monitored visitation with Department supervision, Father improperly took Jade to a psychologist for observation, continued to inspect her for bruises while playing to the video camera, brought friends to the visits and made derogatory comments about Mother and the Department in front of Jade during the visits, and made five recent referrals about Mother abusing Jade. (See *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1658 [citing as a factor supporting removal that "the mother appears to be unable to avoid, and indeed often provokes, angry confrontations with other people while in the company of her daughter"].) In its supplemental disposition report, the Department wrote: "Those who have had the opportunity at [the Department] to evaluate this case with information from mother, child Jade, other members of [the Department] staff and collaterals (such as doctors, therapists, Dept. of Mental Health representatives) have developed serious concerns regarding child Jade's welfare based on father's relentless behavior and actions." Substantial evidence supported the juveniles court's conclusion that less restrictive alternatives were not viable.

29

### B.     *No-Contact Order.*

Beyond ordering Jade removed from Father's custody, the juvenile court further terminated jurisdiction with a family law order giving Mother sole legal and physical custody of Jade and imposing a no-contact order as to Father.  When the juvenile court terminates jurisdiction in a dependency case, it is empowered to make "exit orders" regarding custody and visitation.  (§ 362.4;[7] *In re Chantal S.* (1996) 13 Cal.4th 196, 202– 203.)  The juvenile court is not constrained by any preferences or presumptions in fashioning exit orders pursuant to section 362.4, and therefore no specific finding is required to restrict visitation.  (*In re Jennifer R.* (1993) 14 Cal.App.4th 704, 712; see also *In re Nicholas H.* (2003) 112 Cal.App.4th 251, 268.)  Rather, the juvenile court has broad discretion to make an exit order that serves the child's best interests.  (*In re Chantal S., supra*, at p. 201; *In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319; *In re Jennifer R., supra,* at p. 712.)  "[T]he juvenile court has a special responsibility to the child as *parens patriae* and must look at the totality of the child's circumstances" in determining the child's best interests.  (*In re Roger S.* (1992) 4 Cal.App.4th 25, 30–31.)

We review an exit order for an abuse of discretion and will not disturb such an order "'"unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination."'"  (*In re Stephanie M., supra,* 7 Cal.4th at p. 318; accord, *Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300; *In re Emmanuel R.* (2001) 94 Cal.App.4th 452, 465.)  The test for abuse of discretion is whether the juvenile court exceeded the bounds of reason.  If two or more inferences can reasonably be deduced from the facts, we may not substitute our decision for that of the

---

**7**     Section 362.4 provides in pertinent part:  "When the juvenile court terminates its jurisdiction over a minor who has been adjudged a dependent child of the juvenile court prior to the minor's attainment of the age of 18 years, and proceedings for dissolution of marriage, for nullity of marriage, or for legal separation, of the minor's parents . . . are pending in the superior court of any county, or an order has been entered with regard to the custody of that minor, the juvenile court on its own motion, may issue . . . an order determining the custody of, or visitation with, the child."

juvenile court.  (*In re Stephanie M., supra,* at p. 318; *In re K.D.* (2004) 124 Cal.App.4th 1013, 1018.)

In making the no-contact order, the juvenile court balanced the evidence showing that Father's and Jade's interactions had many positive elements with the evidence showing that Jade's physical and emotional safety remained at risk because of Father's behavior, ultimately determining that only a no-contact order would keep Jade safe.  With respect to Jade's physical safety, the juvenile court reiterated its concerns about Father's lying about Jade's medical symptoms and allowing her to undergo medical tests solely on the basis of those misrepresentations; Father's continuing to demand medical professionals examine every bruise or mark on Jade; and his talking a monitor into allowing him to take Jade to a doctor during a monitored visit.  The juvenile court also received evidence of a concern expressed by Mother, who noted that Father routinely travelled internationally and she discovered him once trying to steal Jade's passport.  In addition, the Department outlined the history of restraining orders against Father involving others, as well as his recent harassment of those involved in the dependency case.  The juvenile court summarized:  "I frankly never have seen a parent so incapable of controlling [himself] in a controlled setting.  Whether it's in court, whether it's at the [Department] office, he simply cannot just visit with his daughter.  He needs to, as the [Human Services Aid worker] pointed out, harass her, harass the Mother, use her to harass the Mother.  It's unbelievable, frankly."

In considering Jade's emotional safety, the juvenile court cited *In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1357, which held "that a court has the power to suspend visits when continuing them would be harmful to a child's emotional well-being."  Expressing its most recent concern about Jade's emotional well-being, the juvenile court stated:  Father "is completely unable to take no for an answer in any respect in this case.  And that even causes the court more concern, when the [Human Services Aid worker] said today that when Jade says no to the Father he gets very frustrated with her.  It causes me a whole lot of concern since he is completely incapable of taking no from anybody else here."

31

Father contends the juvenile court's reliance on *In re Brittany C., supra,* 191 Cal.App.4th 1343 was misplaced, as that case involved older children who had a history of volatile encounters with their parents. (*Id.* at pp. 1357–1358.) But notably, the *In re Brittany C.* court relied on *In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1008, a dependency case involving a seven and one-half month old infant, where the court observed "[t]he court may deny a parent visitation only if visitation would be harmful to the child's emotional well-being." The balance of the cases cited by Father involve visitation orders made in connection with a disposition order pursuant to section 362.1, subdivision (a)—not an exit order under section 362.4—and for that reason a specific showing of detriment was required. (See *In re C.C.* (2009) 172 Cal.App.4th 1481, 1489–1490 [though juvenile court ultimately terminated jurisdiction, challenged visitation order was made at disposition and therefore required a showing that visitation would be detrimental]; *In re Nicholas B., supra,* 88 Cal.App.4th at p. 1138 [discussing visitation order made in connection with disposition order, but finding challenge moot]; *In re Luke L.* (1996) 44 Cal.App.4th 670, 679–680 [reviewing placement order to the extent it negatively affected visitation under § 362.1]; *In re Daniel C. H.* (1990) 220 Cal.App.3d 814, 838–839 [affirming visitation order made in connection with disposition order].)

Here, the juvenile court's exit order was made pursuant to section 362.4, and under that statute the juvenile court considers the question of visitation by determining the child's best interests under a totality of the circumstances. (*In re John W.* (1996) 41 Cal.App.4th 961, 972–973; *In re Jennifer R., supra,* 14 Cal.App.4th at p. 712; *In re Roger S., supra,* 4 Cal.App.4th at pp. 30–31.) Nothing in section 362.4 requires a finding of detriment to deny visitation or contact in an exit order. The Legislature knows how to require the juvenile court to make an express finding of detriment (e.g., §§ 361 .5, subd. (f); 362.1, subd. (a)(2); 366.21, subd. (h); 366.22, subd. (a)) and it did not do so in connection with section 362.4. For this reason, appellant's argument as to why each isolated fact relied on by the juvenile court was not detrimental to Jade affords no basis for us to disturb the juvenile court's exercise of discretion.

We likewise reject appellant's argument that less restrictive alternatives would have been in Jade's best interest. The juvenile court explained that "[n]o matter what safeguards this court has tried to put into effect to allow contact between the Father and Jade, the Father won't abide by it." Describing a recent example of the Father's thwarting the juvenile court's order, the court added: "I specifically made an order that [the Department] not provide to the Father the name of the child's new pediatrician so that that pediatrician would not be harassed and would continue to provide treatment for Jade. And lo and behold, on the witness list of Father for the contested disposition is that new pediatrician's name." In view of evidence showing Father's unwillingness to comply with court orders, the juvenile court was within its discretion to determine that a less restrictive order would be ineffective.

Finally, there is no merit to Father's argument that the no-contact order infringed on his constitutional rights. While the authorities cited by Father accurately provide that a parent has fundamental right to retain the care, custody, management, and companionship of his own child, free of intervention by the government, none establishes that the parent-child relationship may not be disrupted where there are strong reasons for doing so to protect the best interests of the child. (See *In re S.H.* (2003) 111 Cal.App.4th 310, 317 ["the parents' interest in the care, custody and companionship of their children is not to be maintained at the child's expense"]; *In re Julie M.* (1999) 69 Cal.App.4th 41, 50 ["a parent's liberty interest in the care, custody and companionship of children cannot be maintained at the expense of their well-being"].)

Here, the juvenile court clearly articulated its concerns about Father's effect on Jade's well-being. It commented: "I would note for the record that I know that a number of therapists came and testified that [Father] has no psychological diagnosis, that he is not a risk to the child. I would note that none of those witnesses or therapists have spent a fraction of the hours that this court has spent listening to the witnesses, observing [Father], et cetera. And while this court does not have any kind of a psychological degree, and while I do not use this term in a therapeutic way, the only word that I can wrap my brain around that describes this father is sociopathic." Viewing the totality of

33

the circumstances—including Father's continued insistence that Jade constantly needed additional medical treatment and his failure to acknowledge that his behavior posed any risk to her—and considering Jade's best interests, the juvenile court did not abuse its discretion in issuing a no-contact order.[8]

## DISPOSITION

The juvenile court's orders declining to dismiss the section 300 petitions, and its jurisdiction order and subsequent order terminating jurisdiction with a family law order that includes a no-contact order are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J. *

FERNS

We concur:


_____, P. J.

BOREN


_____, J.

ASHMANN-GERST

---

[8]    Should circumstances change, Father may seek to modify the no-contact order pursuant to section 362.4, which provides in part that "[a]ny order issued pursuant to this section shall continue until modified or terminated by a subsequent order of the superior court."

*    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.